**SHAPIRO & SHAPIRO, P.A.**
1063 East Landis Avenue
P.O. Box 787
Vineland, New Jersey 08362
(856) 691-6800
Attorneys for Defendant, Juan Rivera-Velez

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | : UNITED STATES DISTRICT COURT FOR |
| | : THE DISTRICT OF NEW JERSEY |
| Plaintiff, | : |
| | : |
| vs. | : Criminal No.: 06-445 (JEI) |
| | : |
| JUAN RIVERA-VELEZ, | : |
| | : |
| Defendant. | : |

---

### BRIEF ON BEHALF OF DEFENDANT
### JUAN RIVERA-VELEZ ON PRETRIAL MOTIONS

---

Shapiro & Shapiro, P.A.
Harold B. Shapiro, Esquire
1063 East Landis Avenue
P.O. Box 787
Vineland, New Jersey 08362
(856) 691-6800

Attorney for Defendant
Juan Rivera-Velez

<u>INTRODUCTION</u>

Defendant Juan Rivera-Velez is charged with a cocaine trafficking conspiracy, the murder of Miguel Batista, the attempted murder of Rafael Colon-Rodriguez and the use and carrying of a loaded handgun in connection with the Colon attempted murder. This Brief is submitted in support of pretrial motions filed by Defendant. These motions include several discrete evidentiary issues relating to exclusion of the "N" word from a taped telephone conversation, exclusion of a statement made by Defendant to the FBI in September, 1997 and admission of an exculpatory statement made by Defendant to an individual by the name of Saul Febo, shortly after the Batista murder in 1996. Additionally, Defendant has moved, with respect to forensic experts who may be called by the Government at trial, for disclosure and/or supplementation of summaries of expert testimony and, <u>in limine</u> for hearings with respect to the admissibility of such testimony. Defendant has additionally filed a general motion to preserve further discovery rights. Because there already exists clear evidence of an exculpatory nature, Defendant has made specific request pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963) for exculpatory evidence relating to individuals who have been identified as suspects, persons of interest or others who may have had motive to do harm to the victim. Related to the <u>Brady</u> application is a specific application for production of photographic identification evidence. Finally, application is made on behalf of the Defendant for relaxation of a Protective Order so that Defendant may fully participate in his own defense. (Exhibit references are to the Affidavit of Counsel filed and submitted herewith.)

POINT I:    REDACTION OF THE "N' WORD REFERENCES FROM CALL #578 IS REQUIRED BY <u>FED. R. EVID. 401, 402 AND 403</u>.

By way of discovery the Government has provided a transcript of a recorded telephone call between Ray Morales and Juan Rivera-Velez, call #578. Pursuant to correspondence the defense has

requested that transcript call #578 be redacted in three places to remove references to the "N" word. (See 2/13/09 defense discovery letter, attached to which is copy of the transcript of call #578 with the relevant passages circled, Exh. KK). Upon further review, the defense modifies in part its February 13, 2009 letter and proposes the following as redactions. The first passage reads as follows:

**Juan: What are you doing, my "N"**

**Ray: Chillin, chillin**

This passage should be redacted in its entirety.

The second reference reads as follows:

**Juan: Chillin my "N", I was looking around for something but**

**Ray: Oh I hear you.**

Upon further review, the entire passage as circled and attached to counsel's letter of February 13, 2009 does not require redaction. If the three words "Chillin, my "N" were redacted this would be sufficient and the exchange "I was looking around for something but" (Juan) and "Oh, I hear you" (Ray) could remain. With respect to the third passage, this is the last line in the transcript, which reads:

**Juan: All right, my "N"**

This particular passage should be redacted. The call would then end with the passage from Ray reading: "I'll be there in like ten or fifteen minutes."

"It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case." United States v. Doe, 903 F.2d 16, 21 (D.C. Cir. 1990). References to race in a criminal trial may be not only improper and prejudicial, but may constitute reversible error.

United States v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000). It, of course, is a proposition beyond dispute that racial prejudice should be eradicated from the criminal justice system and a criminal defendant should, as a matter of fundamental protection, be protected against the utilization of race or color prejudice in the prosecution of his case. McCleskey v. Kemp, 107 S. Ct. 1756, 1776 (1987).

Fundamentally, the analysis to be made with respect to the "N" word references requires an analysis under Fed. R. Evid. 403. (Following letter notification to the prosecution with regard to defendant's request for redaction, counsel for the prosecution and the defense have discussed this matter on the telephone. Defense counsel shall not characterize the position of the Government, but leave it to the Government to respond. Suffice to note for present purposes that the Government has indicated, at this time, that it not agreeable to the redactions requested.)

Under Rule 403 a cost-benefit analysis is required. Relevance alone does not ensure admission, although it does create a strong presumption in favor of admission. Forrest v. Beloit Corp., 424 F.3d 344, 355 (3d Cir. 2005); Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 (3d Cir. 2002). The balancing process required under Rule 403 requires the utilization of an equation whereby the maximum reasonable probative force is weighed against the likely prejudicial impact. Coleman, 306 F.3d at 1344. The probative value of the "N" word is, at best, quite low (although it can fairly be argued that the "N" word has no relevance to the drug conspiracy, murder and attempted murder charges). The Rule 403 balancing test "ensures that juries are not presented with evidence that is far less probative than it is prejudicial." Id. Clearly, the "N" word presents evidence which has far less probative value and far more unfair prejudicial force.

Fed. R. Evid. 401 and Fed. R. Evid. 402, provide, even before Rule 403 may be reached, that relevant evidence is admissible if it makes the existence or non-existence of a material fact more

3

probable. Forrest, supra; Ansell v. Green Acres Contracting Co. Inc., 347 F.3d 515, 523 (3d Cir. 2003). The three passages containing the "N" word do not address any plausible material fact in issue. While evidence which may have a high probative value is exceptionally difficult to exclude under Rule 403, the opposite must occur with evidence of a low probative value. Coleman, 306 F.3d at 1344-45. And, of course, where the probative value is exceptionally low or non-existent the Rule 403 result becomes clearer yet. Id. at 1344 n.7.

Fundamentally, there must be an appraisal of the genuine need for the evidence against the risk of prejudice. United States v. Bradley, 173 F.3d 225, 230 (3d Cir. 1999); Government of Virgin Islands v. Archibald, 987 F.2d 180, 186 (3d Cir. 1993); United States v. Driggs, 823 F.2d 52, 54 n. 2 (3d Cir. 1997). Where the evidence in question is not necessary to prove a point in issue or where there is other evidence available sufficient to establish the point in issue, exclusion is appropriate, particularly where the prejudice factor is so plainly apparent. Archibald, supra. Certainly, the references to the "N" word are not necessary for what the prosecution may legitimately seek to establish through the introduction of call #578, namely that the discussion between Morales and Rivera-Velez concerning "houses to rent" is a coded discussion about drug dealings (which Defendant shall dispute). The "N" word as contained in call #578 is merely a narrow and minute part of the prosecution case.

The opponent of evidence under a Rule 403 analysis is required to make a showing of particularized danger in order to defeat admissibility. McQueeney v. Wilmington Trust Co., 779 F.2d 916, 925 (3d Cir. 1985). Here, the "N" word triggers a particular danger that Defendant Juan Rivera-Velez would be unfairly prejudiced before the jury. Unfair prejudice, rather than the prejudice which is inherent in any evidence which one party may seek to admit against the other, is prejudice "which

4

cloud[s] impartial scrutiny and reasoned evaluation of the facts" and "which inhibit[s] neutral application of principles of law to the facts as found." Goodman v. Pennsylvania Turnpike Com'n, 293 F.3d 655, 670 (3d Cir. 2002), quoting Wagenmann v. Adams, 829 F.2d 196, 217 (1st Cir. 1997). Unfair prejudice is evidence of a nature which tends to inflame instead of illuminate. Wagenmann, supra. Here, the "N" word does nothing to illuminate the drug conspiracy charge against Defendant, but rather has the clear capacity to inflame. Where unfair prejudice creates an unfair advantage for a party, exclusion is required. Coleman, 306 F.3d at 1343 n.6.

Often, it is difficult to adequately appraise a Rule 403 issue at the pretrial stage. Here, however, it would appear that there is a "record complete enough on the point at issue to be considered a virtual surrogate for a trial record." Glass v. Philadelphia Elec. Co., 34 F.3d 188, 192 n. 5 (3d Cir. 1994). A pretrial ruling will assist the parties both with respect to jury selection and opening statements.

As noted, the Rule 403 analysis measures probative value against potential prejudice. Where the probative value appears slight and where the potential prejudice from inflammatory evidence appears high, Rule 403 exclusion is appropriate. United States v. Sickles, 524 F. Supp. 506, 511 (D.N.J. 1981), aff'd, 688 F.2d 827 (3d Cir. 1982) (Klan references in firearms prosecution, where the motive was arming members of the Klan, admitted in part to shed light on defendant's disposition and excluded in part, i.e. Klan robe and inflammatory slurs). See United States v. Doe, 903 F.2d 16, 21 (D.C. Cir. 1990) (Rule 403 utilized to hold improper repeated references to Jamaican drug dealers). An interesting Rule 403 analysis is found in United States v. Frasch, 818 F.2d 631, 633-34 (7th Cir. 1987), where, in a racketeering, extortion and tax evasion case, references to the "N" word were held not to be reversible on appeal. But, the appellate court suggested that in future cases the

5

offensive words be deleted where redaction could occur without damage to the probative value of the evidence. 818 F.2d at 634. As there is virtually no probative value to the "N" references, deletion here is a remedy which would do no harm to the Government's ability to prosecute its theory of the case. Clearly, for purposes of Rule 403 analysis redaction of the three "N" word references would still leave the prosecution in the position where it can "accomplish what it wishes to accomplish with the evidence without the [offensive] phrase." United States v.Cleveland, 1997 WL 250050 at *3 (E.D. La. 1997). Racial references such as are contained in call #578 should be excluded where they inject extraneous and prejudicial material into the trial. United States v. Cabrera, 222 F.3d 590, 591 n.1 (9th Cir. 2000) (references in drug prosecution to Cuban nationality of defendants required reversal on due process grounds.)

To be sure, there are cases where it would be permissible for racial and similar expletives to remain in evidence, such as where the beliefs and/or prejudices of a particular defendant, as manifested by utilization of racial or other offensive expletives, are critical and necessary to the Government's proofs. United States v. Felton, 417 F.3d 97, 101-02 (1st Cir. 2005) (in prosecution for attempted receipt of explosives, references to Nazi salute, white power etc. admissible because establishment of motive was crucial); United States v. Magleby, 241 F.3d 1306, 1318 (10th Cir. 2001) (references to song lyrics referencing the "N" word had probative value not substantially outweighed by prejudicial impact in cross-burning prosecution); United States v. Allen, 340 F.3d 870, 887 n. 25 (9th Cir. 2003) (skin head and white supremacy evidence was relevant to proving element of intent in prosecution for interference with housing rights based upon race). But, where the testimony is highly prejudicial and not relevant to proving elements of the crime, exclusion would be appropriate. Id., citing Guam v. Shymanovitz, 157 F.3d 1154, 1155 (9th Cir. 1998).

Presumably the prosecution may argue that redaction would break the flow of the conversation, decrease the utility of the evidence or permit the jury to speculate unnecessarily. See United States v. Pritchett, 2006 WL 3826980 at * 5 (N.D. Fla. 2006). Here, however, the redaction may easily be accomplished without harm to the prosecution's utilization of call #578. The prosecution shall still remain able to present to the jury evidence that "houses for rent" was merely a code for the purchase of drugs. As a practical and mechanical matter, there is no reasonable impediment to the redaction of call #578 to remove the three objectionable passages. See generally Old Chief v. United States, 117 S. Ct. 644, 650 n.4 (1997).

By way of summary, the three references to the "N" word in call #578 should be redacted. Such redaction is required because the the "N" word has no probative value, but its retention would unfairly prejudice the Defendant, as well as implicate the other Rule 403 factors.

POINT II:   THE EXCLUSION FROM EVIDENCE OF DEFENDANT'S SEPTEMBER 24, 1997 STATEMENT MADE TO THE FBI IS REQUIRED BY FED. R. EVID. 401, 402 AND 403.

Defendant previously moved to suppress on constitutional grounds statements given by him on September 24, 1997 to the FBI. The constitutional issues for determination at the hearing related to whether Miranda warnings were required, whether even if Miranda warnings were not required Defendant could invoke his right to counsel under the Fifth and Sixth Amendments and whether both constitutionally and by statute the statement was voluntary. (6/4/08 transcript excerpt, Exh. W, referenced herein as "Tr. at ___"; Tr. at 7-8). The substance of the FBI 302 summary of the statements taken from Defendant (Exh. D) was not considered at the hearing conducted on June 4, 2008.

7

Based upon a review of the statements made, it is plain, pursuant to <u>Fed. R. Evid.</u> 401, that the statements are not relevant evidence because they do not "make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Pursuant to <u>Fed. R. Evid.</u> 402 the statements contained in the FBI 302 report from the September 24, 1997 interview are not relevant and therefore not admissible. But, even if admissible under Rules 401 and 402, pursuant to <u>Fed. R. Evid.</u> 403, the statements should be excluded because "[their] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, [and] waste of time ..." The pertinent case law in the Third Circuit, as relates to Evidence Rules 401, 402 and 403, has been set forth in the separate application made with respect to redaction of racial expletives from a taped conversation (see Point I, <u>supra</u>) and therefore need not be repeated here in detail.

A review of relevant testimony of Special Agent Robert Sweeney of the FBI at the June 4, 2008 hearing is illuminating to the evidentiary analysis required, preliminary to an actual analysis of the substance of the September 24, 1997 statements. Special Agent Sweeney confirmed that he never had anything to do with the investigation of Defendant Rivera-Velez for the murder and attempted murder which are the subject of the pending Superseding Indictment. (Tr. at 10). In 1997 Special Agent Sweeney had no interest in investigating the Batista murder. At that time, Special Agent Sweeney barely knew Rivera-Velez. (Tr. at 10-11).

In September 1997 the focus of Special Agent Sweeney was on an individual named Saul Febo, who was a drug trafficker in Camden. (Tr. 11). Special Agent Sweeney's interest in Rivera-Velez in September 1997 was only that he was aware through investigation that Rivera-Velez had an association with Saul Febo and that he worked for him. (Tr. 13). At that time, Rivera-Velez had

been arrested for a homicide, but that homicide had nothing to do with anything that Special Agent Sweeney was working on by way of investigation (and apparently was not drug related). (Tr. 13). The purpose of talking to Rivera-Velez in September 1997 was to ascertain his relationship with Saul Febo because the Government was looking for witnesses for the upcoming indictment in that matter. Special Agent Sweeney was interested in obtaining background information from Rivera-Velez relating to Febo. (Tr. 13-14).  At the time Defendant was in the Camden County Jail, charged with an unrelated murder; Special Agent Sweeney did not know the name of the individual murder Rivera-Velez was charged with murdering. (Tr. 14).

Special Agent Sweeney testified that he believed that Rivera-Velez worked in the "Alleyway". The FBI was looking for people to assist or corroborate information that had been developed concerning drug activities in the "Alleyway".  Rivera-Velez was not a target of the investigation. He was not at a high enough level such that law enforcement had any interest in charging him. (Tr. 29). According to Special Agent Sweeney, mid-management people were charged in the case but not persons who had the status of a trapper, such as Rivera-Velez. (Tr. 30). Special Agent Sweeney confirmed that Rivera-Velez was not a target or suspect in any federal matter that Special Agent Sweeney was investigating in September, 1997. Rivera-Velez was questioned merely because he might have information that would help Special Agent Sweeney's investigation in the prosecution of Saul Febo and his associates. (Tr. 41). Special Agent Sweeney confirmed that in general what he asked Rivera-Velez about were drug activities and murders. (Tr. 43). According to Special Agent Sweeney, Rivera-Velez spoke to him about drug activities and in a general way with regard to specific homicides. (Tr. 50-51). Rivera-Velez was asked what he knew about unsolved homicides. (Tr. 51).

9

According to Special Agent Sweeney,  Rivera-Velez was not read his <u>Miranda</u> rights because he was not considered a witness. The Government was looking for Rivera-Velez's cooperation in the investigation of Saul Febo and others and, as such, there was no interest in charging Rivera-Velez federally. (Tr. 47). At that time, Special Agent Sweeney had no information that Rivera-Velez was involved in any homicide connected to his investigation. (Tr. 47-48). Special Agent Sweeney confirmed that he had no interest in charging Rivera-Velez in his investigation and that he was not in fact charged in that investigation. (Tr. 48).

When specifically asked by the prosecutor at the June 4, 2008 hearing, Special Agent Sweeney indicated that Rivera-Velez did not care about Rivera-Velez's drug trafficking activities. (Tr. 56). Special Agent Sweeney indicated that Rivera-Velez was not known to be a large scale drug trafficker and Defendant said nothing during the interview  inconsistent with that understanding. (Tr. 56). Special Agent Sweeney further confirmed that with respect to the murders he was interested in, he had no reason to believe that Rivera-Velez was involved in any of those murders and that in fact he believed that other people were involved. (Tr. 57). Rivera-Velez's name never came up as a suspect in any of the murders that he was questioned about on September 24, 1997. (Tr. 57). Special Agent Sweeney confirmed that Defendant Rivera-Velez made no self-incriminating statements with regard to any of the murders that he was asked about in the interview. (Tr. 57).

When asked by the prosecutor whether Rivera-Velez provided any assistance during the interview, Special Agent Sweeney indicated that nothing was obtained that was used in the trial or prosecution of the defendants he had been investigating and that there was no derivative use of Rivera-Velez's statements. (Tr. 58).

Special Agent Sweeney indicated that at that particular time no one in federal law

enforcement was looking at Ray Morales. (Tr. 60). The subject of Ray Morales did not come up during the interview of Juan Rivera-Velez conducted on September 24, 1997. (Tr. 61). Special Agent Sweeney did not know that Rivera-Velez was working or allegedly working with Ray Morales at that time. (Tr. 61).

Special Agent Sweeney confirmed that Rivera-Velez did make a statement that he was working for Saul Febo in the "Alleyway". (Tr. 62). What Rivera-Velez told Special Agent Sweeney about drugs was confined to activities in the "Alleyway". (Tr. 63). Special Agent Sweeney confirmed that Rivera-Velez did not provide any statement that he was an enforcer by way of violence for a drug organization. (Tr. 62-63).

Based upon Special Agent Sweeney's testimony at the June 4, 2008 hearing it would appear that all information obtained from Rivera-Velez on September 24, 1997 related to drug activities in the "Alleyway" on behalf of Saul Febo, and was unrelated to drug activities on behalf of the Ray Morales drug organization. Additionally, it appears that Rivera-Velez gave certain background information concerning knowledge of murders. A review of the substance of the FBI 302 report based upon the September 24, 1997 interview confirms that Rivera-Velez made no statements which are relevant to his current prosecution as part of the Ray Morales drug organization. (FBI 302, Exh. D). By way of summary, Rivera-Velez told Special Agent Sweeney and Special Agent Robert S. Jones, who along with Sgt. Ramos of the Camden Police Department, was present at the September 24, 1997 interview that he came to Camden in 1992 with Pedro Torres Contreras. Rivera-Velez advised that Contreras told him that Saul Febo had employment for Puerto Rican selling drugs in Camden. Rivera-Velez told Special Agent Sweeney that he had worked selling cocaine in the "Alley" and lived in the "Alley." Rivera-Velez advised that he knew Febo. Rivera-Velez said that Febo had purchased

a vehicle for him and that he used it and other vehicles to drive around Camden. Rivera-Velez said that Contreras returned to Puerto Rico and was murdered there.

Rivera-Velez stated on the night that Alex Babalonia was killed that he drove by phone booths on Marlton Pike and observed that Hector Mojica and David Luis Cintron had been shot. He commented that he later heard that Cintron had been murdered somewhere in Puerto Rico. Rivera-Velez told Special Agent Sweeney that he had spoke to Cintron at the hospital and Cintron told him that the shooters came in a Mustang Convertible. He was questioned about the murder of Manual DeJesus, a/k/a Manolin, on October 13, 1993. Rivera-Velez stated that he was aware that Jacob Velasquez was involved in the murder. He was questioned concerning the murder of Andy Robledo. He said he had no information concerning that murder. Rivera-Velez said that Robledo sold drugs at a drug set located at 26th and Bank Streets in Camden. He further indicated that Robledo was involved in the murder of someone from North Camden over a dispute involving a kilo of cocaine and that the person Robledo killed was thrown from a vehicle, which person was believed to be Luis Reyes.  Velez was shown a photograph of Wilson Torres. He stated that this person worked in the "Alley". He identified photographs of Saul Febo, Manual DeJesus, a/k/a Manolin, Jacob Velasquez, a/k/a Jake, Andy Robledo, Luis Cintron and Manuel Cordero, a/k/a Manny.

Based upon the substance of the statements made by Rivera-Velez to Special Agent Sweeney and the other officers present on September 24, 1997, it is clear that not one of the statements is relevant to the determination whether Rivera-Velez was part of and participated in any of the separate Ray Morales drug conspiracies. (See Point V, infra, relating to multiple conspiracies). Even if relevancy could be established, which it cannot, any probative value would be very slight and would be substantially outweighed by the danger of unfair prejudice by way of placing Rivera-Velez in a

12

separate drug organization and having knowledge of multiple homicides. Issues would be confused

and the jury would be mislead,  as undue delay would and waste of time would occur, particularly

since Special Agent Sweeney confirmed that Rivera-Velez did not participate in any of the murders.

By way of summary, for the above reasons, the statements made by Rivera-Velez to Special

Agent Sweeney on September 24, 1997 should not be received in evidence. See Evidence Rules 401,

402 and 403.

POINT III:   ADMISSION   INTO   EVIDENCE   OF THE
STATEMENT MADE BY DEFENDANT TO SAUL
FEBO IS PERMITTED PURSUANT TO FED. R.
EVID. 807.

Probative testimony of an affirmative nature exists to support the defense that Defendant

Rivera-Velez "had nothing to do with" the Batista murder. The Government has advised the defense

as follows:

> Finally, please be advised of the following. Saul Febo had a conversation with your client a few days after the murder of Miguel Batista. He asked your client if he killed Batista or knew what happened to him. Your client responded that he had nothing to do with it and confirmed to Febo that the murder had to do with Morales "beefing" with Batista. The Government's position is that the defense may not offer such statements in evidence at the upcoming trial because they are not party-admissions within the meaning and scope of Federal Rule of Evidence 801(d)(2)(A). [emphasis added].
> (11/10/08 AUSA discovery letter, Exh. BB).

The defense has provided notice to the prosecution that it may seek to introduce the statement made

to Febo pursuant to Fed. R. Evid. 807. (2/12/09 defense discovery letter, Exh. II). In response, the

Government takes the position that the statement does not have the required "circumstantial

13

guarantees of trustworthiness", that Rule 807 is not applicable, and that testimony of a similar nature

could be procured through reasonable efforts, suggesting that Defendant has the option to testify in

his own defense. (2/12/09 AUSA discovery letter).

Rule 807 provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered then any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will be best served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Here, each of the requirements of Rule 807 are satisfied: (A) Rivera-Velez's statement is plainly

evidence of a material fact, specifically the contested issue whether he committed  the murder of

Miguel Batista; (B) the statement is more probative as to Defendant's  not guilty status "than any

other evidence which the proponent can procure through reasonable efforts"; the prosecution's

assertion that Defendant can take the witness stand, which would require a waiver of his protected

constitutional right not to testify, does not present as a reasonable alternative; and (C) general

purposes of the evidence rules and "the interest of justice" are well served in permitting a defendant

every opportunity to present evidence which materially advances his defense to the jury.

Concededly, Rule 807 is "to be used only rarely, and in exceptional circumstances" and "appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." United States v. Wright, 363 F.3d 237, 245 (3d Cir. 2004), quoting United States v. Bailey, 581 F.2d 341, 347 (3d Cir. 1978). Clearly, the analysis concerning whether the necessary guarantees of trustworthiness appear presents necessarily as a "highly fact-specific" issue. Wright, 363 F.3d at 246. The statement reported by Febo was made only a few days after the murder when Rivera-Velez was not under investigation. Rivera-Velez had no motive to lie. Id.; United States v. DeLuca, 692 F.2d 1277, 1285 (9th Cir. 1982). Moreover, a plain, simple and clear statement that Defendant was not involved in the Batista murder is probative as to the murder charge. Bohler-Uddeholm America, Inc. v. Ellwood Group, 247 F.3d 79, 112 (3d Cir. 2001).

There is a very special circumstantial guarantee of trustworthiness in the statement provided by Saul Febo. The context of the Government's November 10, 2008 letter appears to be that Febo spoke with law enforcement as part of a cooperation agreement. Febo's status as a cooperator is information not privy to the defense, but may, as appropriate, be confirmed by the Government. If there is a cooperation agreement, then it is a standard provision that the failure of the cooperator to tell the truth to the Government means that the plea agreement would be abrogated. The standard cooperation agreement (which in Febo's case may be produced, as appropriate) requires that if an individual lies to the Government, he is subject to criminal prosecution and penalty. Therefore, Febo had, assuming he was in a cooperating mode with the Government, the highest motivation to tell the truth, thereby lending special circumstantial guarantees of trustworthiness to his reporting of Rivera-

15

Velez's statement. See generally Trustees of Univ. of Pa. v. Lexington Ins. Co., 815 Fed. 2nd 890, 906 (3d Cir. 1987); United States v. Ward, 522 F.2d 1080, 1083 (5th Cir. 1977).

Concededly, Defendant was not under oath when he spoke to Febo. Wright, 363 F.3d at 245. On the other hand, Febo's statement to the Government reporting the statement made by Rivera-Velez to him carries inherent and exceptional guarantees of trustworthiness, since Febo's had the highest interest in telling the truth to the Government.

The statement is probative on the central issue in the murder prosecution and can be proved only through the utilization of the Febo statement, absent waiver of Defendant's constitutional right not to testify. Bohler-Uddeholm, 247 F.3d at 113. The context of the statement also presents strong circumstantial evidence of trustworthiness. The Government's theory of the case is that Rivera-Velez was the right hand man to Ray Morales, the leader of the Morales drug organization. If so (which remains to be proven) Rivera-Velez's position uniquely qualified him to be in a position to tell Febo, only a few days after the murder, that the circumstances of the murder had to do with Morales "beefing" with Batista. Id.

By way of summary, Defendant's reported statement to Febo is evidence of a material fact, is more probative on the point of Defendant's not guilty status than any other evidence which could reasonably be procured and the admission of the statement would serve the purposes of the rules and the interests of justice. As such, the evidence should be received pursuant to Rule 807.

POINT IV:    PROVISION OF EXPERT WITNESS SUMMARIES
IS REQUIRED PURSUANT TO FED. R. CRIM. P.
16(a)(1)(G) AND THE GRANTING OF IN LIMINE
HEARINGS IS REQUIRED PURSUANT TO FED.
R. EVID. 104(a).

The Government has identified a number of forensic experts, including experts in the fields

of drug trafficking, victim injuries, ballistics, autopsy, fingerprints and crime scene investigation. <u>Fed. R. Crim. P.</u> 16(a)(1)(G) requires the prosecution to set forth in written summary "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The Government has not made disclosure under <u>Fed. R. Crim. P.</u> 16(a)(1)(G) with regard to certain expert witnesses. With respect to other expert witnesses, the disclosures do not satisfy the requirements of <u>Fed. R. Crim.</u> 16(a)(1)(G). (Disclosures concerning the drug trafficking and autopsy experts have just been received and shall be reviewed; (see 2/23/09 defense discovery letter re 2/20/09 Government discovery letters, Exh. MM); due to the constraints of time these summaries could not reasonably be addressed at this time; as may be necessary the summaries provided may be addressed on reply briefing.)

There exist a number of preliminary questions concerning qualifications and admissibility of expert testimony, which preliminary questions, it is respectfully submitted, should be determined by the Court, as permitted pursuant to <u>Fed. Evid. R.</u> 104(a). Expert disclosure, as noted, begins with the discovery requirement set forth in <u>Fed. R. Crim. P.</u> 16(a)(1)(G), which provides with respect to expert testimony, as follows:

> Upon a defendant's request, the government must give the defendant a <u>written summary</u> of any testimony the government intends to use in its case-in-chief at trial under Federal Rules of Evidence 702, 703, or 705. The summary must describe <u>the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.</u> [emphasis added].

<u>Fed. R. Evid.</u> 702 provides, with respect to testimony by experts, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

17

> qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmauceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786 (1993) the United States Supreme Court instructed that trial judges are responsible to act as gatekeepers to ensure the exclusion of unreliable expert testimony. Thereafter, in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (119 S. Ct. 1167) (1999) the Supreme Court extended the gatekeeper function to testimony based upon technical or other specialized knowledge, in addition to scientific knowledge. See Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 320-21 (3d Cir. 2003).

Evidence Rule 702 has two principal requirements for admissibility: first, the witness must be an expert; second, the witness must testify to specialized knowledge that will assist the trier of fact. In re Paoli R.R. Yard PCP Litigation, 35 F.3d 717, 741-42 (3d Cir. 1994). Expert testimony is subject to the "trilogy of restrictions on expert testimony: qualification, reliability and fit." Calhoun, 350 F.3d at 321, quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003). This three part test for admissibility was explained by the Calhoun Court:

> First, the witness must be qualified to testify as an expert. Qualification requires "that the witness possess specialized expertise." ... Second, the testimony must be reliable. In other words, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." ... Third, the expert testimony must "fit" ... meaning "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." [internal citations omitted]. Id.

18

Evidence Rule 702 expert testimony must assist the trier of fact, must establish a connection between specialized opinion and particular fact issues in dispute and must "fit" the case. Paoli, 35 F.3d at 742-43. Although the "fit" test "is not that high", "the standard is higher than bare relevance." Id. at 745. The "fit" test requires that the proposed expert testimony be relevant in the context of the case and assist the fact-finder. Calhoun, 350 F.3d at 321. The expert testimony must therefore connect to a pertinent issue as a pre-condition for admissibility. Oddi v. Ford Motor Co., 234 F.3d 136, 144-45 n.12 (3d Cir. 2000). Prior to the Supreme Court opinions in Daubert and Kumbo, the Third Circuit explained what later has been developed in the case law as the "fit" factor:

> An additional consideration under Rule 702 - and another aspect of relevancy - is whether expert testimony proffered in the case is <u>sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute</u>. In this regard, we hold that a defendant who seeks the admission of expert testimony must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to [the issue] under consideration. [emphasis added].
> <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3d Cir. 1985).

The "fit" analysis is particularly relevant in the consideration of the Government's drug trafficking expert.

Fed. R. Evid. 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence shall be determined by the court ..." Under Evidence Rule 104(a) the proponent of the expert testimony is required to establish admissibility by a preponderance of proof. Paoli, 35 F.3d at 744 n.11, quoting Bourjaily v. United States, 483 U.S. 171, 175, 107 S. Ct. 2775 (1987). Pursuant to Evidence Rule 104(a) preliminary questions

concerning the qualifications of witnesses or admissibility of evidence are therefore determined by the court. The utilization of an <u>in limine</u> hearing to determine reliability and other expert evidence issues pursuant to <u>Daubert</u> is well-established. <u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412, 417 (3d Cir. 1999); <u>see also</u> <u>Feit v. Great-West Life and Annuity Ins. Co.</u>, 460 F. Supp. 2d 632, 637 (D.N.J. 2006). Evidence Rule 104(a) hearings are necessary here to determine the admissibility and/or limitations on the testimony of each of the Government experts.

## A. <u>Drug Trafficking Expert</u>.

The prosecution has identified Eric Brown of the Drug Enforcement Administration as its expert. Specifically, the prosecution has advised that "[g]iven that you [defense counsel] are obtaining the trial transcript of the <u>Lewis</u> trial that I recently finished, you should assume for the time being that the testimony of Brown will be very similar to the testimony of Scott [Thompson], the Government's drug trafficking expert in that case." (5/8/08 AUSA discovery letter, Exh. V). The prosecution has provided the resume for Eric Brown and confirmed that he will be utilized as its drug trafficking expert. (Exh. FF, resume attached). The prosecution acknowledged communication from the defense that it would seek to have the expert testimony circumscribed and has further represented that, once the Government begins it witness preparation, "a somewhat detailed outline of the topics he will testify about" would be provided in order to assist in the resolution of any defense application for limitations on such testimony. (11/20/08 AUSA discovery letter, Exh. FF). That outline was just received by the defense and is in the process of being reviewed (2/23/09 defense discovery letter, Exh. MM). For purposes of this application, the defense shall take the suggestion of the prosecution (see 2/23/09 defense discovery letter) and focus upon the testimony of Scott Thompson at the prior <u>Lewis</u> trial. Defendant respectfully reserves the right to further address the Brown summary just received

on reply briefing.

The Lewis trial involved, like this case, the Morales drug organization. But, in this case, unlike Lewis, there will not be extensive testimony with regard to alleged drug dealing by Defendant Juan Rivera-Velez. Rather, it appears that the theory of the prosecution case is that Defendant was a "hit-man" or "contract assassin", which the defense shall obviously dispute. An Evidence Rule 104(a) hearing is essential so that to the extent drug trafficking testimony may be permitted, which under certain circumstances courts have approved and which the defense recognizes, the testimony should be appropriately circumscribed and limited.

As noted, Scott Thompson testified as the drug trafficking expert in the Lewis trial. (See transcript excerpt, Exh. U, from United States v. Lewis, Cr. 06-76 (JEI), 1/16/08 and 1/17/08, referenced herein as "Tr. at ___"). Thompson testified concerning numerous items of drug trafficking terminology. (Tr. at 1734-1745).   Because the prosecution seeks to prove that Rivera-Velez's alleged role in the drug trafficking conspiracy appears principally limited to the 1996 murder of Juan Batista and the 2003 attempted murder of Rafael Colon-Rodriguez (hereinafter referred to as "Colon"), extensive reference to the terminology of the drug trade is not necessary to elucidate the required "fit" with regard to the issues which shall be in issue. At the Lewis trial the drug trafficking expert testified in detail with respect to the process of cooking crack cocaine and the business of selling nickel and dime bags of crack. (Tr. at 1764-66). But, as it does not appear that the prosecution shall attempt to prove that defendant Rivera-Velez was allegedly involved in this aspect of the Morales drug organization, testimony in this area is unnecessary.

The expert Thompson testified that it is not a good business practice in the drug trade to hold on to drug product for an extended period of time because law enforcement may detect the product

or robberies may occur. (Tr. at 1757-58). With respect to the nature of the specific motivation for the Batista murder, involving a dispute between Morales and Batista, and the attempted killing of Colon, testimony with regard to getting rid of product quickly is unnecessary. Again, along similar lines extended testimony concerning sources of drugs, modes of transportation and pricing should be appropriately limited, given the prosecution theory of the case against Rivera-Velez, namely that he was a person who conducted violence on behalf of the Morales drug organization. (Tr. at 1749-1752). Likewise, extensive testimony with regard to heroin and crack sets at numerous locations in Camden, including Atlantic and Norris, the Wall, 8th and Central etc., is unnecessary. (Tr. at 1760-64). To the extent that the proofs from the fact witnesses may purportedly connect to various sets, testimony may be appropriate. References to the geography of Camden, including different areas may in general be acceptable, but references such as to "White Fairview" and "Black Fairview" would appear to be unnecessary, of little probative value and causing race to be injected into the case where race is not essential for the resolution of disputed issues. (Tr. at 1758-59).

As is often the case in drug conspiracy trials, the expert Thompson testified with respect to the utilization of coded language by persons in the drug trade to avoid law enforcement detection. (Tr. at 1746). To the extent that interpretation of telephone calls, which may be admitted into evidence, require "de-coding" this would appear to be a proper form of expert testimony which would not need to be limited.

The expert Thompson testified to the utilization of street names by individuals in the drug business. When asked to explain why such names are utilized he responded: "It's probably more of a sociological answer than anything else, but it's - - that is the way it is. Individuals' nicknames are generally given from a very very young age." (Tr. at 1746-48). In the case of this Defendant,

22

however, the only name other than his given name of Juan Rivera-Velez which legitimately should appear in the factual testimony presented to the jury is "Junito" a version of his name in the Spanish language and culture (similar to Rob or Bob for Robert in the English language and culture). Therefore, expert testimony concerning the utilization of street names, except as specifically necessary to anticipated factual testimony, should be circumscribed.

The greatest concern with respect to the Government's drug trafficking expert is, absent this objection, the probable injection of a general aura of violence into the case. At the outset, considering that the purpose of expert testimony is to assist in understanding matters that would not be readily ascertainable to the average juror, it is hardly a remarkable proposition that violence may be a part of the drug business and that drug dealers sometimes engage in violence. That being said, the excessive and unnecessary extensive expert references in the Lewis trial to violence should be avoided in the Rivera-Velez case.

The expert Thompson testified with respect to names by which guns are referred to, including burner, heater, heat and ratchet (Tr. at 1737), referred to packing and carrying a gun, packing heat, holding and strapped with regard to the use of guns (Tr. at 1742), testified that to "rock someone" means to do harm, to shoot them up or rough them up (Tr. at 1743) and referred to a tre 8 as a .380 semiautomatic or a .38 revolver. (Tr. at 1744-45). Such broad and extensive expert testimony is not necessary in this area as it is self-evident that the allegations in this case involve the shooting of two individuals. The testimony should be tailored to the proofs concerning Defendant's actual use of weapons, according to the Government fact witnesses. The expert Thompson testified to "work" as meaning "committing acts of violence, committing time to the game." (Tr. at 1745). Thompson referred in his testimony to "handle or take care of a problem" meaning "offering to kill somebody,

23

shoot somebody or work somebody over for an individual." (Tr. at 1746). These general references,

absent a "fit" to the proofs,  should be excluded. Injecting community concerns about violence is not

at all probative, but obviously serves to inflame the passions of the community and in this case the

members of the jury. For example, the following testimony from the expert Thompson is revealing:

> Q. What - - what do you see as the use of violence in
> drug trafficking here in Camden? Is it a common thing
> or uncommon thing?
>
> A. Violence is the staple, it's the linchpin, it's what
> holds everything together it's how - - it's how areas
> get established, it's how areas become acquired it's
> how areas - - when I say areas I mean a drug set; it's
> how it's maintained. It's the - - the streets, <u>it's the law
> of the jungle, it's the strongest survive</u>, and how you
> maintain your area is with violence.
>
> You're going to want to commit acts of
> violence to keep people from daring to tread upon
> your area; you're going to use violence to maintain it
> when they do it; it's  - - it's the necessity of the
> business. <u>There is no court of appeals to go to</u> in a - -
>                                          [emphasis added].
> (Tr. at 1771).

The expert Thompson's testimony was replete with additional references to drug violence, including

the following testimony:

> Q. And in what - - what are the types of violent acts
> that you have become familiar with in your many years
> in Camden PD in furtherance of drug trafficking?
>
> A. I've seen everything - - from beatings to torturings
> and murders.
>                          (Tr. at 1772).

Absent admissible fact testimony concerning specific beatings and tortures, such testimony should be

eliminated from this case. Moreover, testimony with respect to the homicide rate in Camden is plainly

an unfairly prejudicial (Tr. at 1773), particularly testimony, in the guise of expert testimony (which

must be testified to with a probability of expert testimony, not as mere speculation), to the effect that

"I'll say approximately 75 percent in some way shape or form have a tie to - - to the drug under

world," referring to the percentage of Camden homicides which are drug-related. [emphasis added].

(Tr. at 1774). In the same vein, references to machine guns and automatic weapons to the effect

"that's stuff legends are made of on the street" (Tr. at 1779) are not germane to the specific weapons

allegedly utilized in the murder of Batista and the attempted murder of Colon. Moreover, gratuitous

references to violent drug gangs should be avoided. Consider the expert Thompson's testimony about

one particular gang:

> Q. Okay. What - - what's the role of respect or fear
> out in the streets as it pertains to violence as well?
>
> A. What is the role?
>
> Q. Yes.
>
> A. The role - - it plays a significant role. We talked
> about the sons of Malcolm X earlier, one did not dare
> tread upon their areas or even try to get close to their
> areas, it was a death sentence to do so...
> (Tr. at 1771-72).

As noted, the expert Thompson had been asked about the sons of Malcolm X. Consider the following

exchange between the prosecutor and expert witness:

> Q. Have you heard of the sons of Malcolm X?
>
> A. Yes, ma'am, I have.
>
> Q. What are they?
>
> A. Sons of Malcolm X are a ruthless entrenched drug
> gang that operated primarily out of the North Camden

25

section of the city. At some point in time, <u>initiation
into their gang encompassed the random shooting or
murder of an individual</u>. They are, again, a well-
entrenged drug gang that control virtually all of North
Camden at one time.

[emphasis added].
(Tr. at 1743-44).

References to violent initiation rights are not just gratuitous but inflammatory in the context of the

theory of the prosecution's case, specifically that Morales directed and/or hired Rivera-Velez to kill

Batista over a drug dispute and then directed him to kill Colon to silence Colon from testifying about

the Batista murder.

Every effort should be made  not to inflame the passions of the jury against the defendant on

trial. Testimony from the Government's drug trafficking expert, such as occurred in the <u>Lewis</u> trial,

would appear to be particularly and unfairly prejudicial, to the extent it may incite passions against

this Defendant. The following question and answer between the prosecutor and expert Thompson

may be considered:

Q. Have you also interviewed a number of Camden
city residents who you do not believe to have been
involved in drug trafficking?

A. Oh, yes.

Q. And in general did these residents have information
about the location of drug sets near their homes?

A. Yes they do.

Q. And in your experience why did such residents have
that information?

A. Well, it's what's generally happening right out in
front of their house, they need only look out their front
window to see the operation that's taking place in

their area in which they live. Many of them are subjected to it as well, <u>when a person can't even walk out their front door or go to the corner store without having three guys sitting on a stoop or the front step of their house</u>, that certainly gets their attention and their going to be aware of what's going on.

Q. And during those interviews have you heard from the regular citizens of Camden that it's important to them to know where the drug sets are located?

A. Sure. They will - - again, the location of a drug set, the by-product of a drug set is going to be violence, that's no secret. So it's - - <u>it's important for people that live in certain neighborhoods to know the area to avoid walking through it if they have to go to the corner store, if they are walking home from church</u>, you know, I'm going to take the long way home because if I have to walk up the street on this corner there's going to be three or four drug dealers so I'll take the long way around and cut through the back alley where there is none. [emphasis added].

(Tr. at 1774-75).

All legitimate efforts should be made to limit the testimony of the prosecution's drug trafficking expert so that "the regular citizens" of South Jersey who may sit on the jury shall decide the case on the proofs against Defendant, rather than on horrific descriptions attributed to community members having to avoid drug sets on their way home from church. In the same vein, it is unnecessary to elicit testimony about drug dealers "flagrantly" sitting on the front steps of an apartment complex. (Tr. at 1762).

Clearly, there is a proper place for drug trafficking expert testimony, such as in the de-coding of telephone communication between drug dealers who do not want to be discovered by law enforcement and other areas. Efforts, however, to incite the passions of citizens who are called to jury duty should be avoided. Consider, for example, the following question and answer between the

prosecutor and the expert Thompson in the <u>Lewis</u> trial:

> Q. Okay. Now, in your experience, what, if anything, do drug dealers do for the people who live near their organization, near their set?
>
> A. Drug dealers that want to exist within the neighborhood will do their best to get a cooperative effort from the people that live there. We've seen dealers buy them gifts, buy them food, throw them parties, pay their rent, even, that's not uncommon.
>
> Q. And why is that?
>
> A. Well, that's where your area - - that's where your business is located, you want to keep those people as happy as possible and you don't want them calling police. And when police do show up, you don't want them cooperating with police.
>
> (Tr. at 1782).

Such testimony brings to mind reports in the not so recent past of La Casa Nostra members handing out turkeys at Thanksgiving time to neighborhood residents in South Philadelphia. While such characterizations may make for interesting newspaper reading, such broad testimony, having absolutely nothing to do with a particular defendant's involvement in an alleged charge, should not be permitted as expert testimony.

As suggested above, the defense does not seek to exclude outright drug trafficking testimony in this trial, but is requesting an <u>in limine</u> hearing pursuant to Evidence Rule 104(a) to ensure that the proposed expert testimony is both reliable and "fits" the pending prosecution against Defendant Rivera-Velez. In narcotics trafficking cases courts have admitted a broad range of expert testimony concerning the "<u>modus operandi</u>" of the drug trade. <u>United States v. McGlory</u>, 968 F.3d 309, 345 (3d Cir. 1992) (holding admissible special knowledge of DEA agent concerning heroin traffic in

28

Thailand, smuggling from Thailand to the United States and heroin entering the United States from

Los Angeles). When relevant, testimony relating to narcotics smuggling, United States v. Wright-

Barker, 784 F.2d 161, 169-170 (3d Cir. 1986) and the structure of criminal organizations, United

States v. Pungitore, 910 F.2d 1084, 1148 (3d Cir. 1990), as cited in McGlory, supra, is permissible;

see also United States v. Davis, 233 F. Supp. 2d 695, 701 (E.D. Pa. 2002).

Fed. R. Evid. 702, when amended in 2000, contemplated that certain types of testimony

relating to drug trafficking would be permitted:

> The amendment requires that the testimony
> must be the product of reliable principles and methods
> that are reliably applied to the facts of the case. While
> the terms "principles" and "methods" may convey a
> certain impression when applied to scientific
> knowledge, they remain relevant when applied to
> testimony based on technical or other specialized
> knowledge. For example, when a law enforcement
> agent testifies regarding the use of code words in a
> drug transaction, the principle used by the agent is that
> participants in such transactions regularly use code
> words to conceal the nature of their activities. The
> method used by the agent is the application of
> extensive experience to analyze the meaning of the
> conversations. So long as the principles and methods
> are reliable and applied reliably to the facts of the case,
> this type of testimony should be admitted.
> [emphasis added]
> (Advisory Committee Notes,
> 2000 Amendments).

The sound rationale underlying the admissibility of expert testimony concerning certain aspects of

drug trafficking is recognized. But, allowing extensive testimony concerning drug violence is not

required. For example, expert drug trafficking is hardly necessary to elucidate the principal point of

the prosecution of Rivera-Velez for the attempted murder of Colon, which is that, according to the

prosecution's theory of the case, Morales and Rivera-Velez, the two people who allegedly committed the murder of Batista, wanted to kill Colon so that he would not be available to testify against them in the Batista murder.

In the case at bar, there is simply no legitimate issue in dispute between the parties which would require extensive testimony from the prosecution's drug trafficking expert. See United States v. Cruz, 981 F.2d 659, 662 (2nd Cir. 1992). Here, the facts in dispute are simply that Defendant, by virtue of his not guilty plea, has placed in issue that he did not shoot Batista and that he did not shoot Colon. Expert testimony, in drug cases and otherwise, generally to be admissible "must have esoteric aspects reasonably perceived as beyond the ken of the jury." Cruz, 981 F.2d at 664. The danger here is that expert testimony, with broad and uncircumscribed references to all forms of drug violence and the suffering of the community, does not "fit" and does not provide necessary reliable information to the jury. Accordingly, "expert testimony" cannot be used solely to bolster the credibility of the government's fact witnesses by mirroring their version of events." Id. In the context of the case at bar, there is very little remarkable or beyond "the ken of the average juror" with regard to Defendant's alleged role in the drug trafficking conspiracy. See United States v. Castillo, 924 F.2d 1232, 1233 (2nd Cir. 1991) (the purpose of forcing drug customers to snort cocaine in order to expose undercover police officers would be obvious to any juror's common sense and not require expert testimony).

The following syllogism may be considered: (1) drug dealers use guns to settle drug disputes and to deter people from testifying against them; (2) Raymond Morales and Juan Rivera-Velez are drug dealers; therefore, (3) Juan Rivera-Velez used guns to kill Batista and try to Colon. Id. at 1234. Absent appropriate limits on drug trafficking testimony, the jury may place too much credence upon

an expert's gratuitous observations concerning violence in the drug trade.

The mere fact that a witness, such as the DEA Agent Brown or the expert Thompson who testified in the Lewis trial, may have been qualified to testify on prior occasions (Tr. at 1731-32) is not a strong indicator of reliability for an expert witness as "the crucible of litigation makes for a poor classroom." Excok v. Kmart Corp., 233 F.3d 734, 744 n.5 (3d Cir. 2000); see also Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594-95 (D.N.J. 2003). While drug trafficking testimony may be appropriate in certain circumstances, as set forth above, there is a danger where the discipline would appear more like a social science than a hard science and more subjective, rather than reproducible in a scientific manner. Prior to the acceptance of any testimony from DEA Agent Brown the Court should conduct a hearing, pursuant to Evidence Rule 104(a), to determine the necessary contours and limitations on such testimony. As noted above, the defense has just received the Government's Fed. R. Crim. P. 16(a)(1)(G) summary and may address same after review in any reply brief.

## B. Treating Doctor.

The prosecution has advised that it would be calling as an expert witness a medical professional to testify concerning the nature of Colon's injuries as a result of the April 2003 shooting. (5/8/09 AUSA discovery letter, Exh. V). In response to further requests by the defense to name and identify such medical expert (10/14/08 defense discovery letter Exh. AA), the prosecution indicated that it was attempting to locate Dr. James Eakins, the treating physician for Colon. The prosecution advised that it was not aware that Dr. Eakins had written an expert report and that it did not intend to ask that such a report be prepared. Rather, the prosecution indicated it would rely upon the requirements of Fed. R. Crim. P. 16(a)(1)(G) and provide a summary of the witness testimony.

Significantly, the prosecution advised and presumably shall continue to take such position that "the relevance of this testimony is that the Government must prove an attempt/intent to kill, <u>see</u> Superseding Indictment, Count 3, and the nature and extent of the injuries clearly is relevant to proof of that element." (11/10/08 AUSA discovery letter, Exh. BB). The prosecution has since provided a written summary of expert testimony it would elicit from Dr. Eakins at trial, as follows (1/14/09 AUSA discovery letter, Exh. HH):

> 1. He reviewed all the aforementioned medical records;
>
> 2. He was the first doctor to see and treat Rafael Colon when he was admitted at Cooper Hospital, although other doctors there also treated Colon;
>
> 3. Colon suffered a life-threatening injury;
>
> 4. The bullet clearly fragmented (although Dr. Eakins did not review any x-rays, the records clearly indicated this). However, there should not be any long term consequences from those fragments remaining in Colon's body;
>
> 5. Colon suffered a skull fracture as a result of the bullet wound;
>
> 6. Colon also suffered a fracture of his spine, although the doctor saw no reason to believe it was anything other than a technical fracture, without symptoms or long-term consequences. Apparently as a precaution, Colon wore a cervical collar for a few months afterwards.
>
> 7. Colon suffered some significant hearing loss at the time (common for a wound like this), but such a loss often clears up or decreases later; the doctor does not know at this time whether Colon still has hearing problems. The Government's understanding,

> though from talking with Colon, is that he has suffered
> permanent damage to the hearing.

In addition to the written summary, set forth above, the prosecution also provided the resume for Dr. Eakins. (1/14/09 AUSA discovery letter, Exh. HH).

At the outset, it is clear that notwithstanding the written summary contained in the Government's letter of January 14, 2009, there has not been compliance with the requirement of <u>Fed. R. Crim.</u> 16(a)(1)(G) that the bases and reasons for the opinions be described. For example, with respect to the opinion that Colon suffered a life-threatening injury no support is provided. Similarly, there is not a summary of the bases and reasons for the opinion that the bullet fragmented, that there was a skull fracture, a fracture of the spine and some significant hearing loss (which appears otherwise to be based merely upon government communication with Colon).

Clearly, with a properly supplemented <u>Fed. R. Crim. P.</u> 16(a)(1)(G) summary Dr. Eakins may testify with respect to the diagnosis and ascertainment of injuries. But, based upon the anticipated testimony that Colon was shot in the head, it is hardly necessary for an expert to testify that the injuries were life-threatening. Nor should Dr. Eakins be permitted to travel into the area of defendant's intent, as suggested by the prosecution's reference to its obligation to "prove an attempt/intent to kill". Any testimony from Dr. Eakins should be carefully circumscribed so that the treating doctor does not render an expert opinion that "the defendant did or did not have the mental state or condition constituting an element of the crime charged", as prohibited by <u>Fed. R. Evid.</u> 704(b).

Certainly, testimony from the treating doctor with respect to Colon's condition when he was admitted to the hospital, to the treatment which was rendered to him and to the diagnosis and specific

33

suffering of injuries should be permitted. <u>United States v. Fog Horn</u>, 2006 WL 4017477 at *5 (D.N.M. 2006). In fact, such testimony from the treating doctor may be properly characterized not as expert testimony, but as permissible lay testimony. <u>United States v. Henderson</u>, 409 F.3d 1293, 1290 (11th Cir. 2005). Testimony as to the nature of injuries suffered and diagnosis may be received, but it is respectfully submitted the Court should disallow any testimony from an expert stating or inferring an intent to kill. <u>State v. Chambers</u>, 507 N.W. 2d 237, 238, 39 (Minn. 1993).

By way of summary, the Government's <u>Fed. R. Crim. P.</u> 16(a)(1)(G) disclosure requires supplementation to set forth the bases and reasons for the opinions of the treating doctor. A hearing pursuant to Evidence Rule 104(a) should occur prior to the jury hearing testimony from Dr. Eakins. It appears that any testimony from Dr. Eakins should more properly be received as the opinion and testimony of the treating physician, rather than expert testimony which may intrude upon the jury's function to determine state of mind with regard to the intent to kill charge.

## C. Ballistics

The Government has framed the forensic ballistics issue in this case in the context of a single shell casing having been found on the front seat of the vehicle occupied by the murder victim, Miguel Batista. Specifically, the prosecution has indicated it is exploring "whether a ballistics or firearms expert can render an opinion about the type of weapon used and the relative location of that weapon that expelled the casing at the time it did so." (5/8/08 AUSA discovery letter, Exh.V). The defense subsequently communicated with the prosecution to request advice as to the status of the ballistics inquiry. (10/14/08 defense discovery letter, Exh. AA). The prosecution then advised that an expert, James Story, would be testifying that a shell casing found at the crime scene was of a certain caliber and that therefore a handgun of that caliber was used to fire the cartridge casing, notwithstanding that

neither the murder weapon nor the bullet passed through Batista's head had been recovered. The prosecution advises that the medical examiner would testify that the bullet entered Batista's head from the rear and exited  through the front and that the medical examiner would be able to testify about the  size of the entry wound and that same was consistent with a bullet fired from a handgun of that caliber. (11/10/08 AUSA discovery letter, Exh. BB). This aspect of the case is presently in the posture where a resume has not been provided for James Story, nor has a written summary of his expert testimony been provided pursuant to Fed. R. Crim. P. 16(a)(1)(G). The requirements for Fed. R. Evid. 702 admissibility, relating to qualifications, reliability and fit, cannot now be determined.

### D. Autopsy.

Pursuant to prior discovery, the defense received relating to the autopsy the following: Report of Investigation by Medical Examiner, Autopsy Report, Certificate of Death and Certificate of Identification. (11/29/07 AUSA discovery letter, with attachments, Exh. P). These reports submitted are part of the overall medical examiner work, but are simply typed forms and not the complete narrative autopsy report. The Government has just provided additional autopsy reports and a summary of expert testimony which the defense shall review. The prosecution has previously advised that Dr. Robert Segal, the medical examiner, would testify with respect to cause of death and the entry and exit of the bullet that killed Batista. (11/10/08 AUSA discovery letter, Exh. BB).

Defendant reserves the right to pursue an independent review of the autopsy with respect to the anticipated testimony from the medical examiner, including in part the connection which the prosecution seems to make between testimony from the medical examiner and testimony from a ballistics expert with respect to the caliber of shell casing and handgun, neither item of which can be produced in evidence.

Defendant reserves the right to request a Evidence Rule 104(a) application for a hearing to determine the nature and extent of testimony which may be received from the medical examiner, as the defense is in the process of reviewing materials just received. Defendant may address this issue further on reply briefing.

E. Fingerprint Expert.

The prosecution has complied with its obligations under Fed. R. Crim. P. 16(a)(1)(G) with respect to fingerprint testimony. A hearing is required, however, to determine necessary limitations of expert testimony in this area.

The prosecution referenced the lifting of latent prints from the Buick station wagon in which Batista was murdered in an early discovery letter. (11/27/06 AUSA discovery letter, Exh. O; see also 11/29/06 AUSA discovery letter, referencing request for latent fingerprint examination of a firearm received but apparently not the firearm utilized in the Batista homicide, Exh. P).

The Government submitted on October 23, 2006 a request for fingerprint analysis to the Federal Bureau of Investigation. (Exh.Q). The request for examination contained extraneous and unproven allegations that Rivera-Velez was "an alleged contract assassin" and was suspected of multiple homicides in Puerto Rico, including a quadruple homicide. Fortunately, the FBI fingerprint analysis was limited to a comparison of latent prints and the known prints of Rivera-Velez, not making reference to the prejudicial allegations contained in the forwarding correspondence.

The report and request for examination reflected that Defendant's left hand was not printed due to paralysis and that the right hand was slightly disfigured. (Exh. Q). Reference was made to a print appearing to be significant, specifically a latent print lifted from the rear passenger side window on the interior side of the Batista vehicle, resembling the heal of the hand with a bent pinky finger,

36

clearly a reference to Defendant's deformity. It was reported that the agent who took the fingerprints from Defendant made multiple attempts to lift and roll in the area of the hand, with further indication that if sufficient similarities were identified by the fingerprint examiner, further prints could be obtained from Defendant by using black powder and kinder print paper.

The Report of Examination prepared by Michelle Thompson, who has been identified as the Government's fingerprint expert, reflected that ten latent fingerprints, three latent palm prints and one latent impression had been analyzed. (Exh. Q). Ms. Thompson concluded that one latent fingerprint and three palm prints are not a fingerprint or right palm prints of Rivera-Velez. She further stated that "[t]he remaining latent fingerprints and the latent impression were compared, insofar as possible, with the fingerprints and right palm print of VELEZ, but no identification was effected." Under the remark section of the report, Ms. Thompson indicated that no additional palm prints were available for Velez and that complete and clearly recorded fingerprints of Velez and the other individuals who were in the car were necessary for conclusive comparisons. (Exh. Q).

An Evidence Rule 104(a) hearing is required to make certain that any testimony from the FBI fingerprint examiner is limited narrowly to testimony that no match was made between the latent prints lifted and the known prints of Rivera-Velez. Because there may be a possibility, as suggested in communication received from the Government, that testimony from the expert would go beyond the opinion in her report to other related matters, limitation on the expert testimony is requested, as explained below.

The prosecution has advised that the FBI laboratory has been unsuccessful to date in analyzing latent prints because the prints of Rivera-Velez taken are insufficient due to his deformities. The Government advised that it would likely be seeking additional prints from Defendant. (5/8/08

37

AUSA discovery letter, Exh. V). No request has been made for additional prints from Defendant.

The Government has indicated that because of the lack of fingerprint evidence, in order essentially to "front" (defense characterization) the issue, it would be calling an expert who would testify that the latent print was not a print of value and the latent print was not that of Defendant. (Exh. V). With respect to that testimony, obviously the defense would have no dispute. However, there is concern that additional testimony may be elicited that the analysis was incomplete due to Defendant's deformities.  Such testimony would require an <u>Fed. R. Evid.</u> 403 analysis.

There is, also, an outstanding discovery issue with respect to the fingerprints. Reference has been made to prosecution communication providing a printout obtained from the Camden County Prosecutor's Office relating to identification of a latent print as that of Miguel Batista. (11/25/08 AUSA discovery letter, Exh. GG). The defense has requested detail and documentation concerning the particular latent print, particularly whether the latent print may be the latent print from the rear of the vehicle which the prosecution had attempted to connect to Defendant. (See 2/23/09 defense discovery letter, Exh. MM).

By way of summary, to the extent that the prosecution may seek to elicit expert testimony from the fingerprint expert beyond the non-match between the latent prints submitted and the prints obtained from Defendant, a hearing is necessary so that such testimony may be properly limited and circumscribed.

F. <u>Crime Scene Investigation</u>.

The prosecution has advised with respect to a crime lab report relating to the Colon shooting, and in particular eleven photographs taken of the scene. (7/14/06 AUSA discovery letter, Exh. K). Additionally, the prosecution has advised that it would qualify a crime scene investigator as an expert

in the processing of crime scenes and the development and lifting of latent prints, this with respect to the latent print lifted from the inside rear window of the Batista vehicle. (5/8/08 AUSA discovery letter, Exh. V). The prosecution has provided the resume of Michael Aaron as its expert with respect to the processing of crime scenes. (11/10/08 AUSA discovery letter, Exh. BB). At this point, a more detailed written summary, consistent with <u>Fed. R. Crim. P.</u> 16(a)(1)(G), is necessary with regard to the opinions to be elicited from Mr. Aaron and the bases and reasons for same.

> POINT V:   BECAUSE COUNT ONE CHARGES MULTIPLE CONSPIRACIES RELIEF FROM PREJUDICIAL JOINDER AND MATERIAL VARIANCE IS REQUIRED BY WAY OF DISMISSAL OF COUNT ONE AND COUNT TWO OF THE SUPERSEDING <u>INDICTMENT</u>.

The Superseding Indictment (Exh. N) returned on November 1, 2006, would, absent judicial correction, place together before the jury a ten year drug conspiracy, a 1996 murder, a 2003 attempted murder and a loaded handgun charge relating to the attempted murder.   This makes sense from a strategic sense as the conspiracy serves as an umbrella for the murder and attempted murder charges. The advantages to the prosecution in such an approach are obvious. But this approach gives rise to substantive defects in the prosecution including improper joinder, multiple conspiracies, material variance and statute of limitations violations. Count One charges Rivera-Velez with participating in a powder cocaine and crack cocaine drug conspiracy during the period from an unspecified date in 1993 to April 5, 2003. Count Two charges that on September 26, 1996 "during and in relation to a drug trafficking crime ... the conspiracy ... as alleged in Count 1 ... and <u>which is realleged and incorporated by reference herein</u>" Defendant killed Miguel Batista. [emphasis added]. Count Three charges that on April 5, 2003 Defendant attempted to kill Rafael Colon-Rodriguez to

prevent Colon from communicating to a law enforcement officer and judge information concerning

the September 26, 1996 murder of Batista "as alleged in Count 2 ... and which is realleged and

incorporated by reference herein." [emphasis added]. Count Four charges Defendant with using and

carrying a firearm, a loaded handgun, during and in relation to the tampering of a witness and the

attempted killing of Colon "as alleged in Count 3 ... and which is realleged and incorporated by

reference herein." [emphasis added]. The original indictment (Exh. H), returned June 14, 2006,

charged only, as Counts One and Two respectively, the Colon attempted murder and the illegal use

of firearm (which became Counts Three and Four respectively in the Superseding Indictment).

The proofs will show that instead of a single unitary ten year conspiracy, there really were a

number of separate drug conspiracies, all involving Raymond Morales as the leader or hub of drug

trafficking operations during the ten years. The Government has previously presented to the Court

trial evidence relating to the ten year drug conspiracy charged in this case. (See United States v.

Lewis, Cr. No. 06-76 (JEI), excerpt from Lewis trial transcript collected as Exh. T, referred to as "Tr.

at ___"). The evidence will show that Ray Morales worked for and became the right hand man for

the Tony DeJesus-Rodriguez drug organization during the early 1990's. The evidence will show that

Morales had a falling out with DeJesus-Rodriguez in early 1996. (Tr. 670-71). The evidence will

show that by the mid-1990's Ray Morales started his own drug operation organization. The evidence

will show that in October 1997, after having pled guilty to charges relating to prior drug activity,

Morales was sent to state prison where he remained until November 2000. (Tr. 586). According to

Morales, while he was in prison first Victor Rodriguez, then Ruben Lozado, ran a drug organization

on his behalf. (Tr. 627, 741-42, 828).  The evidence will show when Morales was released from

prison he established a drug organization and from 2001 to 2003 sold his largest amount of powder

cocaine. (Tr. 562-63). During this time period Morales had two principal cocaine sources, one Columbian through New York City, the other Mexican through Arizona. (Tr. 562-63). Although the conspiracy charges an end date of April 5, 2003, coincidentally the date of the attempted murder of Rafael Colon, the Morales drug operation had ceased operations as of on or about March 8, 2003 when Morales was arrested. (See HIDTA report (in redacted form) 4/2/03, Exh. F confirming that another individual was attempting to establish himself/herself as the main source of cocaine in Camden folloiwng Morales arrest).

Where the charge is one of conspiracy "the possibilities for miscarriage of justice to particular individuals becomes greater and greater." Kotteakos, 328 U.S. 750, 776, 66 S. Ct. 1239 (1946).

The Third Circuit has adopted a three part analysis to determine whether a series of events may constitute a single conspiracy. First, it must be determined whether there is a common goal between conspirators. Second, it must be determined whether an agreement contemplated the accomplishment of a continuous result that would not continue without the continuous cooperation of the conspirators. Third, it must be determined the extent to which the participants overlapped in their various dealings. United States v. Kelly, 852 F.2d 255, 259 (3d Cir. 1989); accord United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007). It is insufficient in a charged drug conspiracy, such as this case, to "defin[e] the common enterprise as simply the illegal sale of drugs" as such "would render the conspiracy an essentially limitless enterprise." United States v. Swafford, 512 F.3d 833, 842 n.3 (6th Cir. 2008). The problem presented by combining a number of conspiracies in the same conspiracy count is that the allegations charge a "single conspiracy, criminal acts loosely, if at all, connected." United States v. Bertolotti, 529 F.2d 149, 151 (2d Cir. 1975).

As noted, it appears that at least two separate conspiracies, the initial DeJesus conspiracy and

41

the first Morales organization, had ended by the time that Ray Morales went to jail in 1997. Ray Morales was in prison during the late 1990's. Defendant was also in prison during this general time period serving a sentence on a charge unrelated to drug activity.

Any activity involving separate conspiracies which had occurred on or about November 1997 or before should have been charged within the five year statute of limitations time period required. United States v. Richardson, 532 F.3d 1279, 1292 (11ᵗʰ Cir. 2008). 18 U.S.C. §3282 requires that criminal prosecutions be instituted "within five years next after such offense shall have been convicted." See generally United States v. Atiyeh, 402 F.3d 354, 362 (3d Cir.), cert. den., 546 U.S. 1068, 126 S. Ct. 812 (2005); United States v. Heldon, 479 F. Supp. 316, 319-320 (E.D. Pa. 1979). Here, the prior Morales drug conspiracies ended in 1997. Therefore, consideration of the five year statute of limitations is appropriate. Cf. United States v. Aldea, 174 Fed. Appx. 52, 2006 WL 637142 at * 5-6 (3d Cir. 2006) (not for publication). Where a statute of limitations defense is raised the issue may be determined, as now on motion for dismissal, United States v. Waldrop, 786 F. Supp. 1194, 1995 (M.D. Pa. 1991), aff'd, 983 F.2d 1024 (3d Cir. 1992), cert. den., 508 U.S. 950, 113 S. Ct. 2440 (1993), or by way of judgment for acquittal, which remedy is preserved. Aldea, 2006 WL 637142 at * 5. While the Superseding Indictment must be accepted as true concerning the factual allegations in it as relates to a motion to dismiss, Waldrop, 786 F. Supp. at 1199, here the flaw in the indictment is not factual, but strategic, the decision by the Government to charge multiple conspiracies. Because the separate conspiracies which existed and ended prior to November 1, 2002 should have been prosecuted within the five year statute of limitations time period, the charge of the Batista murder in 1996, which is charged as in furtherance of the drug conspiracy as it existed on and before September 26, 1996, would likewise be time barred.

This case does not charge a continuous "chain conspiracy", but in reality a series of separate conspiracies interrupted by significant breaks in time. United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979). What has occurred here is that "the prosecuting authorities unwisely adopted what may have appeared to be a simple expedient, i.e., the charge of a conspiracy that was too broad, sweeping together into a single prosecution all of the loose ends that involve law enforcement investigators encountering their investigation of the illicit activity". United States v. Eubanks, 591 F.2d 513, 521 (Conc. Op.) (9th Cir. 1979). Because of improper joinder, if uncorrected, this case would go to trial and at the conclusion of the prosecution's case an application would be made for material variance because the proofs will show multiple conspiracies, rather than a single conspiracy. Bertolotti, 529 F.2d at 154.

At bottom, the ultimate issue for determination shall be whether, as the defense contends, the single conspiracy charged is really a series of separate conspiracies or whether one single, unitary conspiracy remained intact for the full ten year period alleged in Count One of the Superseding Indictment. Kelly, 852 F.2d at 259. At that point the analysis shall be whether there was a variance between the indictment and the trial proofs and, if so, whether substantial rights of the defendant were prejudiced. Id. at 258; Greenridge, 495 F.3d at 93; United States v. Barr, 963 F.2d 641, 648 (3d Cir. 1992).

The substantial prejudice which shall occur in this trial, if the separate conspiracies are not separated out and charged separately, is that "by piling inference upon inference", this defendant will be subjected to "a dragnet to draw in all substantive crimes." Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943). Defendant Rivera-Velez is alleged to have played a role in the Morales drug organization. The theory of the government's case is that this Defendant was a hit man for the

43

Morales drug organization. As such, he is charged with the murder of Batista in 1996 and the attempted murder of Colon in 2003. Those are charges serious enough and Defendant should not have to contend with all of the other drug and violence crimes which may be presented under the umbrella of the ten year drug conspiracy. Unless corrected, Defendant shall be subject to the danger that he will be convicted for substantive crimes committed by other persons. Swafford, 512 F.3d at 842-43; Bertolotti, 529 F.2d at 156. Additionally, given that Defendant's previous application for a bill of particulars was denied (August 10, 2007 Order, para. 15, Exh. R), there has been little if no discovery received relating to the supposed role of Rivera-Velez in the drug organization, separate and apart from his charged role as a hit man. Other than a telephone conversation between Morales and Rivera-Velez, shortly before Morales was arrested, which presumably the prosecution shall argue involved Rivera-Velez seeking to purchase drugs (Call #583, referenced in Point I, supra), there is little, if any evidence relating to drug activities by Rivera-Velez during the charged ten year period. Therefore, in addition to the prejudice in being subjected to substantive crimes committed by others, there is substantial prejudice of surprise at trial. Swafford, supra.

As the number of conspiracies within a single charged conspiracy may increase, the danger of prejudice from a material variance between the indictment and the proofs increases. Bertolotti, 529 F.2d at 156. It may fairly be submitted, in this particular case, that the danger of prejudice shall increase exponentially against Rivera-Velez if the prosecution is permitted to place into evidence all of the evidence it seeks to present relating to wide-spread drug dealing and violence in the City of Camden over a ten year time period.

In conspiracy cases such as this, the advantage to the prosecution and the potential unfair prejudice to the Defendant is that conspiracy law permits the prosecution to have the jury consider

44

against a defendant on trial the acts or statements of any conspirator if it is found that the defendant on trial is a member of the conspiracy. Kotteakos, 328 U.S. at 771. Here what shall occur, if Defendant is subjected to the full ten year span of the conspiracy charge, is that "[u]nder the guise of its single conspiracy theory, the Government [may subject Defendant] to voluminous testimony relating to unconnected crimes in which he took no part", with all of these unconnected crimes being presented "under the roof of an alleged single conspiracy." Bertolotti, 529 F.2d at 157. Such a scenario creates an enormous spill-over impact with the very real potential for the transfer of guilt from members of other conspiracies to Defendant in this case. Kotteakos, 328 U.S. at 774; Bertolotti, 529 F.2d at 156. The danger where multiple conspiracies are charged is that "[t]he greater looseness generally allowed for specifying the offense and its details, for receiving proof, and generally in the conduct of a trial, becomes magnified as the numbers increase." Kotteakos, 328 U.S. at 776; Swafford, 512 F.3d at 843.

If the prosecution is permitted to present proofs with regard to separate Morales drug conspiracies from the 1990's, the jury may be exposed to shocking and inflammatory testimony concerning violence, murder, guns and narcotics, all parts of separate conspiracies and involving crimes which occurred beyond the applicable statute of limitations. See Bertolotti, 529 F.2d at 158. (See Point IV, A, supra relating to requested limitations on drug trafficking expert testimony). What the prosecution artfully has achieved in Count One of the Superseding Indictment is to sandwich or wrap together the 1996 Batista murder with the 2003 attempted murder of Colon. As such, "the Government has merely merged several conspiracies for the sake of convenience." Id. at 155.

The burden of trial preparation is particularly daunting in this case since Defendant is faced with the task of defending against many, many numerous and distinct transactions which occurred

45

over a ten year time period. Kotteakos, 528 U.S. at 706-07. Here, where due to Morales being away in prison for a period of approximately three years in the late 1990's, a significant lapse of time served to divide the earlier conspiracies from those conspiracies which occurred after Morales was released from prison, beginning in late 2000 and/or early 2001 and continuing until approximately March of 2003. The lapse of time was not a mere one year, but a significant period of time, lending credence to the conclusion that analytically separate conspiracies rather than a single conspiracy should have been charged. United States v. DiPasquale, 740 F.2d 1282, 1290 (1984). In this case, Morales set up a separate organization for drug dealing when he went away to prison in 1997. See Richardson, 532 F.3d at 1286. This case presents a situation far from the familiar principle that the prosecution is not required to prove the exact dates of an offense so long as the proofs are reasonably near to the dates charged. Here, the amount of wiggle room is enormous, sufficient through which to drive a tractor trailer. See generally Swafford, 512 F.3d at 844 n.6.

Permitting the Government to proceed with the prosecution on a single ten year conspiracy shall, it is respectfully submitted, result in a material variance at trial. See United States v. Russano, 257 F.2d 712 (2nd Cir. 1958). Ultimately, the Court shall need to consider whether the Government should be permitted to "string together" what are "separate and distinct crimes" in a situation "when the only nexus among them lies in the fact that one man participated in all", that person being Ray Morales. Kotteakos, 328 U.S. at 773.

If the Government's theory of the Batista murder and the Colon attempted murder is correct, which Defendant disputes, then Defendant, at the direction of Morales, shot and killed Batista and then, some seven years later, again at the direction of Morales, attempted to kill but was not successful in killing Colon, with the purpose being to silence Colon from testifying about what he

knew of the Batista murder. While the Government has charged the Batista and Colon murder and attempted murder as separate counts, its theory of the case is that the two events are interrelated. In any event, the proofs in this case will indicate that Defendant allegedly participated in only two crime(s) of violence (assuming Fed. R. Evid. 404(b) evidence is not proffered before trial). DiPasquale, 740 F.2d at 1291-92. The proofs will show, with respect to the organization and operation of the Morales drug organization, including numerous acts of violence not attributed to Rivera-Velez, that this Defendant had little or no connection to the charged drug conspiracies, except allegedly to Ray Morales, the hub of the conspiracy. Richardson, 532 F.3d at 1288. Morales was the hub of all of the conspiratorial acts the Government shall attempt to prove at trial. Rivera-Velez on the other hand was a spoke in a charged conspiracy, which in reality were a number of separate conspiracies. As such, this was a rimless wheel conspiracy where members of the conspiracy had no connection with one another, other than with one individual directing the overall conspiracy. Id. While Defendant was not the hub of the conspiracy charged, he will suffer from all of the transferred proofs and guilt relating to the activities organized and directed by Ray Morales over a period of ten years. Id. at 1287-88. These numerous acts of drug and violence crimes were committed by different drug organizations, separated in time and participants. Greenidge, 495 F.3d at 95.

In essence, any material variance which may occur at trial, if this case is permitted to be tried under a single, unitary conspiracy presentation, is, in essence, an issue of whether there was proper joinder of charges in the first place. See Kotteakos, 328 U.S. at 774. In this case, the proofs will demonstrate at trial that there are a number of separate conspiracies. The separate conspiracies should have been charged separately. Fed. R. Crim. P. 8(a), with respect to the joinder of offenses, provides:

> The indictment or information may charge a defendant in separate counts with the 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute part of a common scheme or plan.

Therefore, the prosecution may charge separately and present to the jury separate conspiracy charges, subject, of course, to statute of limitations requirements. However, such joinder of separate charges may unfairly prejudice a defendant and therefore there is a mechanism for relief from prejudicial joinder. Fed. R. Crim. P. 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires. [emphasis added].

Justice requires that the improper joinder of conspiracies be corrected and that only those conspiracies which are not time barred be presented to the jury. In this case it is not appropriate "to authorize the Government to string together, for common trial, [numerous] separate and distinct crimes, conspiracies relating in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." Richardson, 532 F.3d at 745.

By way of summary, the Court should order that Count One, the conspiracy count, be dismissed, and that those conspiracies which are not time barred by 18 U.S.C. §3282 be recharged as separate conspiracies, and, further, that the 1996 murder charged, which is predicated on a time barred conspiracy, be dismissed. Defendant shall reserve all variance issues which may properly be raised at trial.

POINT VI:   DEFENDANT  SHOULD  BE  GRANTED THE
RIGHT  TO  RAISE  ADDITIONAL  DISCOVERY
ISSUES AS THEY MAY ARISE.

In the context of the various other applications which are being filed at this time, references have been made to discovery correspondence between counsel.  Defense counsel recognizes that discovery obligations are continuing and that items are being provided as the case progresses toward trial. A fair review of the correspondence indicates that counsel on both sides have cooperated in facilitating the exchange of discovery. It is anticipated that items which may have been requested but not yet provided shall be provided or that explanation shall be provided alternatively with respect to items which have not been provided. Under this circumstance, rather than present the Court at this time with a particular application relating to discovery items that counsel continue to communicate upon, it is respectfully requested that both parties be permitted to reserve the right to bring before the Court by formal motion or otherwise any unresolved discovery issues. In this context, Defendant simply moves to preserve his right to make appropriate application to the Court, as may be required.

POINT VII:   THE  GOVERNMENT  SHOULD  BE  DIRECTED
TO  MAKE  DISCLOSURES  PURSUANT  TO
BRADY V. MARYLAND.

Point VII is set forth in the separate Letter Brief submitted to the Trial Judge, but not electronically filed with the Clerk. This procedure is followed to comply with both the letter and spirit of the September 22, 2008 Protective Order (Exh. Y), which does not presently permit disclosure of the names, addresses and other identifying information of persons referenced in the Government's November 27, 2006 discovery letter. (Exh. O). If the Protective Order is relaxed (see Point IX, infra) this Point may then be electronically filed. If not, Defendant reserves the right to have this Point made

49

part of the Court record by filing under seal or other appropriate mechanism.

POINT VIII:   THE GOVERNMENT SHOULD BE DIRECTED
TO PRODUCE ITEMS OF PHOTOGRAPHIC
<u>DISCOVERY</u>.

Point VIII is set forth in the separate Letter Brief submitted to the Trial Judge, but not electronically filed with the Clerk. This procedure is followed to comply with both the letter and spirit of the September 22, 2008 Protective Order (Exh. Y), which does not presently permit disclosure of the names, addresses and other identifying information of persons referenced in the Government's November 27, 2006 discovery letter. (Exh. O). If the Protective Order is relaxed (see Point IX, <u>infra</u>) this Point may then be electronically filed. If not, Defendant reserves the right to have this Point made part of the Court record by filing under seal or other appropriate mechanism.

POINT IX:   DEFENDANT SHOULD BE GRANTED RELIEF
FROM   AND   RELAXATION   OF   THE
PROTECTIVE ORDER PROHIBITING DEFENSE
COUNSEL   FROM   SHARING   CERTAIN
<u>DISCOVERY WITH DEFENDANT</u>.

Point IX is set forth in the separate Letter Brief submitted to the Trial Judge, but not electronically filed with the Clerk. This procedure is followed to comply with both the letter and spirit of the September 22, 2008 Protective Order (Exh. Y), which does not presently permit disclosure of the names, addresses and other identifying information of persons referenced in the Government's November 27, 2006 discovery letter. (Exh. O). If the Protective Order is relaxed this Point IX may then be electronically filed. If not, Defendant reserves the right to have this Point made part of the Court record by filing under seal or other appropriate mechanism.

<u>CONCLUSION</u>

For the reasons set forth herein, it is respectfully requested that the relief requested in the

pretrial motions of Defendant Juan Rivera-Velez be granted.

Respectfully submitted,


s/Harold B. Shapiro
_____
HAROLD B. SHAPIRO, ESQUIRE

DATED: February 25, 2009